Vernon H. Jorgensen v. Commissioner. Vernon H. Jorgensen and Dorothy Jorgensen v. Commissioner.
Jorgensen v. Commissioner
Docket Nos. 36142-36144.
United States Tax Court
T.C. Memo 1956-113; 1956 Tax Ct. Memo LEXIS 183; 15 T.C.M. (CCH) 564; T.C.M. (RIA) 56113; May 9, 1956
*183 Held: Respondent erred in failing to include as a factor in making his computation of [petitioners]' net worth during the taxable years a large amount of cash kept by petitioner in his home. Held, further: Petitioner was not guilty of fraud. Stanley L. Drexler, Esq., and Ellis J. Sobol, Esq., for the petitioners. Richard C. McLaughlin, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax of petitioner, Vernon H. Jorgensen, in Dockets numbered 36142 and 36143, and additions thereto for fraud, for the years 1946 and 1947, respectively, as follows: 50% Addition
Year
Deficiency
for Fraud
1946
$ 5,085.18
$2,542.59
1947
16,536.15
8,268.07 Respondent also determined a deficiency of $18,542.58 in income tax of the two petitioners, husband and wife, in Docket numbered 36144 and an addition thereto for fraud of $9,271.29 for the year 1948. The issues presented involve (1) the correctness of respondent's action in omitting from his computation of taxable net income of [petitioners], by means of the so-called increase in net worth method, any cash on hand, *184 (2) the amount spent by [petitioners] for personal living expenses, and (3) whether some parts of the deficiencies so determined are respectively due to fraud with intent to evade tax. Findings of Fact That portion of the facts which was stipulated is so found and the stipulation of facts filed by the parties, with exhibits attached, is, by this reference, made a part hereof. The petitioner in Dockets numbered 36142 and 36143 is Vernon H. Jorgensen, who resides in Denver, Colorado. Vernon is also co-petitioner with his wife, Dorothy, in Docket numbered 36144. Vernon filed individual income tax returns for the years 1946 and 1947 and a joint return with Dorothy for the year 1948 with the then collector of internal revenue for the district of Colorado. The net income reported by Vernon for 1946 and 1947 and by Vernon and Dorothy for 1948 and that determined by the Commissioner for such years, follows: Net Income
Net Income
Year
Reported
Determined
1946
$ 2,922.87
$17,954.06
1947
10,652.39
41,780.11
1948
14,287.38
57,453.78
The parties stipulate that Vernon had assets and liabilities as at December 31, 1945, 1946, 1947 and 1948, respectively, *185 in at least the following aggregate amounts: Liabilities
Year
and
Ended
Assets
Reductions
Net Assets
12/31/45
$ 26,453.44
$ 1,694.23
$ 24,759.21
12/31/46
45,166.15
4,863.88
40,302.27
12/31/47
84,547.80
11,178.68
73,369.12
12/31/48
144,186.61
14,826.53
129,360.08
Vernon was born in 1903 in Helper, Utah. He came to Denver in or about 1909 and has lived there in various residences since that time. Throughout his life, Vernon has been an extremely industrious and frugal person. He began earning money at a very early age. When he was 6 or 8 years old, he earned money by selling buttermilk after school and on Saturdays from a horsedrawn covered wagon, which buttermilk he had purchased from a creamery. Vernon continued earning money in this fashion until he was 12 years old when he stopped his schooling after having completed the fifth grade. In about 1919, Vernon began caring for lawns, furnaces and hot-water heaters and removing snow from sidewalks in the "country-club district," a high-priced residential area in Denver. The homes in the area occupy lots which average in size from three lots to one-half block. Vernon contracted with *186 the individual residents to do such work for them, for which he received from $15.00 to $60.00 per month, depending upon the size of the lot and the amount of work to be done. The average thus received was approximately $18.00 per month from an average number of 30 customers. In addition to his work for individual residents, Vernon was hired by a group of persons to care for a parkway in the center of Franklin Street, for which he was paid extra. During part of one winter, at which time Vernon had approximately 36 customers, Vernon paid his brother, Joseph, $150.00 per month to assist him in taking care of one-half of his customers. Vernon was big and strong, and put in long hours. In the winter he started work at 3:00 a.m. Persons in that line of work usually were at work by 2 or 3 o'clock in the morning when it snowed at night, in order to clear the walks. They never started working later than 4:00 a.m. Vernon returned home from work each evening at about 9:00 p.m. He worked every day, including Sundays and holidays. Vernon's expenses of doing business were small. He bought no materials; his original equipment consisted of a pair of sheep shears for trimming, a small one-wheel *187 trimmer, a 21-inch lawnmower, hose, a 12feet X 12feet canvas in which to carry grass, and a bicycle. He rode to work on the street car, and later, when the Model-T became popular, he acquired one and rode to work in it. For most of the period during which he did this work, Vernon worked alone. He was assisted by his brothers-in-law, Lloyd Van Cleave and John Brower, for about one month in or about 1922. Prior to the time when Vernon was married, in February, 1922, and at the same time Vernon was working in the "country-club district," Vernon entered into a truck-gardening partnership with his brother, Joseph. The truck garden was located near 2099 South Santa Fe Drive, Denver, Colorado, where Vernon and his brother lived. Vernon was purchasing the land, consisting of eight or ten city blocks, costing about $1,800.00 per block, and Joseph supplied the labor. The brothers shared in the earnings from the truck garden, which was a profitable operation. In the year 1921, petitioner and his brother received over $4,000.00 from a celery crop alone. In 1922 or 1923, Vernon purchased a home on West Nevada Place in Denver for $1,200.00. In or about 1925, Vernon bought a filling station at *188 2209 South Santa Fe Drive, Denver, from the same person from whom he had bought the land used in the truck garden operation. The filling station was operated by Allen Miller, and Vernon was paid rent of $150.00 per month by the operator. He kept the filling station until 1934 and received $150.00 per month during the entire period of his ownership. Due to the advent of natural gas and thermostatic heating, in or about 1930, Vernon's winter work in the "country-club district" decreased. In 1930, while he was still doing such work, Vernon bought a contract to haul manure from Fort Logan, a distance of 20 miles. He had the truck garden with "hot beds" in which he could use the manure as fertilizer. After he had had the contract for about a month, Vernon entered into a contract with C. W. Savery of the Great Western Mushroom Company (hereinafter called Great Western) to haul horse manure needed in the mushroom business of Great Western from Fort Warren, Cheyenne, Wyoming, at $2.00, $2.25, or $2.50 per ton. Fort Warren is located approximately 102 miles from Denver. Great Western had 39 mushroom houses and used a great deal of manure in its business of growing mushrooms. Its products *189 were shipped all over the country. In the course of its business, Great Western generally used from 40 to 45 tons of manure a week. During the month of March, 1934, Vernon hauled 230 tons of manure to Great Western. His average pay from Great Western for hauling manure was from $85.00 to $100.00 per week. Vernon paid his own expenses of doing business. He also hauled manure from the Cherry Hills Riding Academy in Denver as well as from Fort Warren in Wyoming. For the operation, he purchased a new truck at a cost of $1,100.00. The manure he bought at Cherry Hills cost him about $5.00 per month; that at Fort Warren was free; Vernon paid six cents per ton for manure at Fort Logan. He frequently hauled at night. During the period of four to four and one-half years while thus hauling manure, Vernon also continued his other work. In 1934 or 1935, after he stopped hauling manure, Vernon began hauling and selling gasoline. He took the trucks he had used in the manure-hauling operation, put tanks on the trailers, and used them for hauling gasoline. He purchased gasoline from the Champlin Refining Company in Kansas at the Chicago Journal price and sold it to cut-rate service stations and garages. *190 His average mark-up was 3 to 3 1/2 cents per gallon. He continued hauling gasoline out of Kansas until after the bombing of Pearl Harbor, December 7, 1941, when he was informed by the Office of Defense Transportation that he could no longer haul gasoline from Kansas. During the period from 1934 or 1935 until 1941, he dealt only in gasoline. From 1942 on, he also handled distillate. From subsequent to December, 1941, and through the taxable years in question, Vernon continued to haul and sell gasoline, during which period he bought his gasoline exclusively from Oriental Refining Company (hereinafter called Oriental). During this period his average mark-up was from one-fourth to one-half cent per gallon. Vernon kept no books or records of his wholesale gasoline business and computed his gross profit therefrom by applying to the gallonage secured from the refinery an arbitrary mark-up of one-half cent per gallon. A civil action was filed against the petitioner, doing business as Cascade Oil Company, on May 9, 1941, for violating the cost provisions of the "Unfair Practices Act," Chapter 261 of the Session Laws of the State of Colorado for 1937, by allegedly selling gasoline below cost *191 during the period from January, 1941, to May, 1941. This action was subsequently dismissed for failure of the State to prosecute. During 1948, Martin Oil Company was a customer of Vernon's. Martin purchased an estimated 80,000 to 100,000 gallons of gasoline from Vernon during the period from June, 1948, to December, 1948, when, due to a shortage, it was unable to obtain gasoline through its usual sources of supply. For such gasoline delivered to its stations Martin paid Vernon 20.3 cents per gallon. Martin operated independent cut-rate filling stations, where the prices were about two cents per gallon cheaper than the advertised brands. One who, like Vernon, buys gasoline at the refinery at the dock price for resale at a mark-up to customers, be they consumers, retailers or wholesalers, is known in the petroleum business as a "peddler." During the years 1946 through 1948, Vernon was a peddler. The major oil companies, producers of the advertised brands, sell on what is known as the jobber or tank-wagon price, which represents the price at which the name-brand gasoline is delivered to a service station. The tank-wagon price is in excess of three cents per gallon more than the dock *192 price paid by Vernon purchased at Oriental. During the years 1946 through 1948, Vernon, d/b/a Cascade Oil Company, purchased from Oriental gasoline and fuel in gallonage as follows: White
No. 1
No. 2
Diesel
Ethyl
Bronze
U.S.M.
Distillate
Distillate
Fuel
Kerosene
1946
48,115
124,375
13,185
54,150
1947
111,310
473,228
19,500
116,448
1,956
10,512
1,200
1948
157,269
1,291,600
23,739
122,067
2,479
39,099
2,400
Paul Anderson purchased gasoline from the petitioner on both credit and cash terms. As of December 31, 1947, Paul Anderson had outstanding notes payable to the petitioner in the total amount of $3,893.52. As of December 31, 1948, Paul Anderson had outstanding notes and accounts payable to the petitioner in the respective amounts of $1,739.00 and $925.36. During 1945, 1946 and 1947, Vernon purchased 3,280 acres of land in Eastern Adams and Eastern Arapahoe Counties in Colorado. During 1946, 1947 and 1948, Vernon farmed this land, in addition to running his gasoline business. He sold the wheat he raised to the Farmers Union Elevator in Denver and to the Lindfors Elevator at Strasburg. He received one check *193 a year from each elevator. Vernon started saving money when he was six or eight years old. In 1919 or 1920, he opened a savings account in the Broadway National Bank at First Avenue and Broadway in Denver. In 1922 or 1923, when he purchased a home on West Nevada Place for $1,200.00 cash, he took the money from his savings. In December, 1925, he bought a filling station for $2,800.00 with money he took from his savings. Prior to 1922, he undertook purchasing a truck garden, consisting of eight or ten city blocks, for about $1,800.00 a block. On December 17, 1925, Vernon went with his brother to the Broadway National Bank on Broadway in order to make a deposit. The bank had that day been closed by the bank examiner. Vernon lost approximately $3,200.00 therein. Vernon then started putting his money in a bank at Bayaud and Broadway. The banker shot himself. Thereafter, for some time, Vernon did not maintain a savings account. Instead, he kept his money at his residence. In or about 1933, 1934 or 1935, Vernon started putting his money in a green metal box 10inch long, 4inch wide, and 3inch deep. Prior to that time his wife had kept the box. Vernon's basement had a dirt floor. Vernon burnied *194 the box about a foot deep in his basement beneath a barrel containing empty fruit jars. When it rained, the moisture came through the sides of the walls and the money kept in the box became moldy. Throughout all the years, Vernon saved a substantial portion of his earnings. In 1942, Vernon's brother, Joe A. Jorgensen, who had moved to Nebraska in 1925 or 1926, wrote to Vernon asking if he were interested in going into the cattle business and asking him to come to Nebraska to look into the matter. There was a 1400-acre ranch for sale near Grand Island, Nebraska. It was an island in the Platte River. The purchase price for the ranch was $42,000. As the deal was originally discussed Vernon himself wanted to pay cash for the ranch and have Joe run it on a fifty-fifty basis. Vernon was to supply the equipment, and his brother the cattle. Joe suggested that Vernon pay half of the purchase price down; that they obtain a mortgage on the land for the balance of the purchase price; that Joe put his stock, machinery and employees on the place; and that the money which would have gone to pay the other half of the purchase price be used to buy more cattle, if it appeared necessary. The real estate *195 broker with whom the brothers were dealing subsequently notified Joe that the ranch had been sold to a third party. The brothers did not give up the idea of buying a cattle ranch. In 1944, Vernon made inquiry of Russell Hodge, a real estate broker in Denver, respecting a cattle ranch in Saguache, Colorado, which ranch Hodge had advertised in various county newspapers. The offering circular, or brochure, circulated by Hodge stated that the seller would allow 3 percent off for cash or would finance one-half of the purchase price at 4 percent for 10 years. At a conference in Saguache at which Edwin Tobler, one of the sellers, Vernon, Joe and Hodge were present, Vernon offered to pay the entire purchase price in cash. Despite his original proposal with respect to accepting cash, Tobler by this time had changed his mind and did not want cash. He agreed to take one-half cash and the original contract was written for one-half cash and $15,000 down. On August 23, 1944, Vernon, accompanied by Joe and Hodge, went to the National City Bank, where he was to buy a cashier's check for $15,000, payable to the First National Bank of Saguache, which was to hold the contract and the money in escrow. *196 On this date, Vernon deposited $15,000.77 in his savings account No. X2554 at the National City Bank, which deposit consisted of cash in the amount of $14,965.00 and a check in the amount of $35.77. Upon the suggestion of the bank president, Albert E. Upton, followed by subsequent negotiations, it was agreed that the down payment should be reduced to $3,000.00. Under the second contract, therefore, the purchase price of $54,700.00 was to be paid by a down payment of $3,000 and an additional $20,750.00 upon delivery of the deeds and a trust deed of $30,950.00. The terms of the first and second contracts were the same as to the total purchase price. When Joe later learned that the artesian wells on the ranch were infected with typhoid germs, the transaction was called off and the $3,000.00 down payment was lost. When the money kept in the aforementioned metal box became moldy and began to deteriorate, Vernon removed it and placed it in a glass jar, where it would be protected from water damage. Part of the time this jar was kept at the same place as the metal box had been. Dorothy also had the jar at times and once had it hidden in a flour barrel. About the same time that Vernon made *197 the cash deposit in the National City Bank on August 23, 1944, he left the glass jar, which was a one-quart Mason fruit jar containing $65,000.00 in $100 bills, in the custody of his sister, Laura Elizabeth Jorgensen Murphy, and her daughter, Gertrude, during the negotiations for the above-mentioned ranch. Before she would agree to keep the money for her brother, Laura, in the presence of Gertrude and petitioner, counted the money in the jar and verified the amount $65,000.00. [1] Again, before she returned it to Vernon some weeks later, she counted it twice. The glass jar of money was seen, but not counted, by at least two other witnesses. The money remained with the Murphys for a period of approximately three weeks to a month. From 1929 to December 31, 1948, Vernon borrowed money ranging in amounts from $70.00 to $7,000.00 from the National City Bank. The interest rates on these loans varied from 6 percent to 12 percent. On several occasions the loans were paid by means of refinancing. Vernon's record *198 of payment was good. In connection with obtaining these loans, Vernon filed financial statements in which one item called for was the amount of cash on hand and in banks. In statements filed on the following dates, Vernon listed the following amounts of cash on hand and in banks: Cash on Hand
Date
and in Banks
1/29/41
$ 300.00
6/ 5/46
7,500.00
2/14/47
680.00 It was Vernon's idea that cash on hand meant currency in one's pocket. He also thought it good business not to reveal all of his assets to anyone. At December 31, 1948, Vernon had in his possession $35,401.13 in uncashed wheat checks, which checks were reported as income for 1948. Vernon carried these checks around in his pocket and one for $26,000.00 was not cashed until September of the next year. On July 1, 1949, Vernon borrowed $1,500.00 from the National City Bank and gave his note bearing 8 percent interest and payable January 5, 1950. In making some of the foregoing purchases of farm land and farm equipment and other assets during the years 1946 through 1948, Vernon took money from his glass jar, deposited it in the bank and then drew against it. He made numerous deposits in and drew many checks *199 against his commercial checking account at the National City Bank. Vernon's savings account No. X2554 at such bank was relatively inactive during the years 1946 through 1948 and his savings account No. X7491 thereat had been closed on May 31, 1944. The balances in Vernon's bank accounts as of January 1, 1944, and December 31, 1944, were as follows: The National City Bank of Denver, Colorado
Savings
Savings
Checking
Account
Account
Date
Account
No. X7491
No. X2554
1/ 1/44
None
$604.93
None
12/31/44
None
Closed
$13,059.65
Colorado National Bank, Denver, Colorado
Savings
Checking
Account
Date
Account
No. 152485
1/ 1/44
$785.90
0
12/31/44
19.61
0
Vernon filed his first income tax return, a nontaxable return, in 1943. Previous to this time, petitioner entertained the idea that the income tax applied only to "rich folks." In 1947, Vernon and Paul Anderson went to the National City Bank in order to obtain a loan for Anderson. The bank would not lend Anderson any money because he was not solvent. Anderson signed a $4,500.00 note, which was dated November 18, 1947, and on which the payee was Vernon. *200 Although the payee of the note was Vernon, the money was obtained from the National City Bank. Vernon received $4,500.00 from the bank on December 4, 1947, and deposited this amount in his checking account at the same bank on the same date. The bank collected the money due on the note. Anderson paid nothing on the note. The note was paid off by Vernon, who delivered gasoline to a service station owned by Anderson but leased to another. Vernon sold the gasoline at one and three-tenths cents per gallon about the amount paid by him. Vernon then paid the bank back by using the one-cent a gallon part of the mark-up for that purpose. On December 7, 1945, Vernon paid $4,500.00 cash to Liberty Trucks and Parts Co. On January 2, 1946, he paid $7,100.00 cash to the same company. On January 3, 1946, Vernon paid $1,900.00 cash to that company. The statutory notices of deficiency issued by respondent allowed no cash on hand as of December 31, 1945, or at any other dates involved in the computation. Respondent also held that petitioners' personal living expenses were at least $2,400 per year during the taxable years. Respondent further held that petitioners' returns were false and fraudulent with *201 intent to evade tax. We make the following findings as ultimate conclusions of fact. Vernon had undeposited cash on hand at December 31, 1945, in the amount of $65,000.00, of which amount approximately $12,020.19, $20,276.46 and $30,703.35 was later deposited in his bank account and/or expended for land, farm machinery and equipment in the years 1946, 1947 and 1948, respectively, leaving undeposited cash on hand at December 31, 1946, 1947 and 1948 in the approximate amounts of $52,479.81, $32,703.35 and $2,000.00 respectively. No part of any deficiencies for the taxable years, if any are found, is due to fraud with the intent of evading tax. The returns of the taxpayers for the years involved were not false or fraudulent, nor were they filed with the intent of evading the payment of the taxes due. Opinion VAN FOSSAN, Judge: By using the socalled increase in net worth plus personal expenditures method of reconstructing income, respondent has determined the net taxable income of petitioners for each of the years 1946 through 1948 to have been substantially in excess of that reported. Further, respondent has determined that some part of the deficiency thus resulting in each *202 year was due to fraud with intent to evade tax and has imposed the 50 percent addition to tax provided in Section 293(b), Internal Revenue Code of 1939. Petitioners concede the propriety of the use of the method employed by respondent. They challenge the accuracy of respondent's determination with respect to two items, namely, the failure of respondent to reflect in his net worth computation the presence of any undeposited cash on hand at December 31, 1945, or at any other time within the taxable period, and his determination that petitioners' personal living expenses were in the amount of $2,400.00 per year. They also contest the finding of fraud. For his part, respondent concedes that he erred in not including in his computation the sum of $9,000.00 cash on hand at December 31, 1945. This concession serves to reduce the amount of taxable net income and, hence, the deficiency determined for the year 1946. It leaves undisturbed the deficiencies determined for 1947 and 1948. Petitioners maintain, however, that they had cash on hand as at December 31, 1945, in the approximate amount of $80,000, which amount substantially accounts for the increase in their net worth as computed by *203 respondent. We do not entirely agree. Realizing the frequency with which similar claims have been advanced in certain other cases of this nature and that such claims have not always been found to be credible, we have examined the evidence found in this record with the extremely careful scrutiny it deserves. We have studied the character, understanding, personal interest and candor of each of the many witnesses, more especially those who had no intimate or personal relationship with the petitioners. We have weighed, in the light thereof, Vernon's testimony, which testimony at first impression seemed incredible as to the source and method of accumulation by him of a large amount of cash on hand. On completion of such study, we find ourselves impelled to the conclusion that his testimony is grounded firmly in truth and that it is essentially corroborated by the whole record. Respondent in effect asks us to disregard the record and substantially all of petitioner's testimony as "self-serving" and "inherently improbable." In the broad sense in which respondent uses the term "self-serving," most, if not all, of a taxpayer's personal testimony in support of his theory of his case would *204 have to be disregarded. We know of no such rule of evidence. Certainly, the taxpayer is entitled to tell his story and if the story brings conviction in the mind of the Court that it is the truth, he is entitled to prevail. Such testimony is not the self-serving testimony proscribed by the rule of evidence dealing therewith. As to the contention that petitioner's testimony is "wholly improbable," the record in the case and the attitude and candor of the witnesses convince us that it speaks the truth. In short, remarkable though the testimony may seem to respondent, it has brought conviction in our mind and we accept it as approximately the truth. We have, therefore, concluded and found as an ultimate fact that Vernon had undeposited cash on hand at December 31, 1945, in the amount of $65,000.00, of which amount approximately $12,020.19, $20,276.46 and $30,703.35 was deposited in his bank account and/or expended for land, farm machinery and equipment in the years 1946, 1947 and 1948, respectively, leaving undeposited cash on hand at December 31, 1946, 1947 and 1948 in the approximate amounts of $52,479.81, $32,703.35 and $2,000.00, respectively. Accordingly, respondent's computation *205 of petitioners' net worth for each of the years involved will be adjusted to reflect the figures set out above. As to the smaller contested issue of living expenses, we find ourselves unconvinced that respondent erred in holding that such expenses amounted to at least $2,400.00 a year. We therefore sustain respondent as to this item. There remains the question of fraud, as to which our ultimate finding, above, is dispositive and reflects our firm conviction that the quantum of proof is insufficient to show that any part of the deficiencies, if any there be, was due to fraud with intent to evade tax. Little more need be said by way of explanation except that albeit the maze of figures found on the record cannot be entirely reconciled, what we have said above with regard to the testimony is of equal application here, and such testimony belies the existence of a fraudulent intent. Decisions will be entered under Rule 50. Footnotes
1. Petitioner at the hearing demonstrated to the Court that a one-quart jar could contain $65,000.00 in $100 bills (650 bills), by exhibiting such a jar containing 650 $1 bills.↩